## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CARMEN RIVERA

               Plaintiff,

  v.

MICHAEL J. ASTRUE, COMMISSIONER,
SOCIAL SECURITY

           Defendant.

3:10-CV-01035 (CSH)

**October 22, 2014**

## RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A NEW HEARING, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

**HAIGHT,** Senior District Judge:

Plaintiff Carmen Rivera brings this appeal under §§ 205(g) and 1631(c) of the Social Security Act, as amended 42 U.S.C. §§ 405(g) and 1383(c), seeking review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying her application for Supplemental Security Income Benefits ( or "SSI") under Title XVI of the Social Security Act. Plaintiff has moved for an order reversing the final decision of the Commissioner or, in the alternative, an order remanding this case back to the Commissioner for further proceedings, including a new hearing before a newly assigned Administrative Law Judge. Doc. [13]. The Commissioner has moved for an order affirming the decision. Doc. [19]. The motions have been fully briefed. They are ripe for adjudication. This Ruling decides them.

### I.  BACKGROUND

Plaintiff is a 43 year old Hispanic female (Certified Transcript of Administrative Proceedings, dated August 10, 2010, ["Tr."] (Tr. 14)). She speaks fluent English, is a high school

graduate, and the mother of five children. (Tr. 14; 39). She has been to prison twice, once for a drug related offense, and a second time for violating probation. (Tr. 50-51; 210-11; 244, 266). As a result of her criminal convictions, she lost custody of her minor children who were placed in foster care when she was incarcerated. (Tr. 49). She is unmarried and lives with her sister. (Tr. 37.) Other family members, including her mother, daughter and grand daughter, live close by. (Tr. 10; 43).

Plaintiff claims that she is unable to work because she suffers from anxiety and depression and "sees [and] hears things." (Tr. 147).

Notwithstanding its unfavorable decision, the Commissioner granted Plaintiff's applications for SSI in 1997 and 2004, on grounds that her psychiatric condition rose to the level of a "listed impairment," as defined in 20 C.F.R. Part 404, Subpart P, 1. (Tr. 137). But as the Commissioner giveth so too he taketh away. Reviewing the first award in 2002, the Commissioner concluded that Plaintiff was no longer disabled, and terminated her benefits. (Tr. 137, 232). Thereafter, the Commissioner granted, then terminated, Plaintiff's SSI benefits a second time.[1] (Tr. 137).

Plaintiff filed the instant application for SSI on May 31, 2007, shortly after her release from prison in February of the same year. (Tr. 7).[2] The Commissioner denied Plaintiff's application

---

[1]Plaintiff states that she made this second successful application for SSI benefits in May 2004. Doc. [13-1] at 2. It is unclear in the record exactly when after that date the award rendered was terminated, although that event apparently occurred sometime prior to the instant application, which was filed on May 31, 2007. *Id.* at 2-3.

[2]The Commissioner provides conflicting dates for Plaintiff's filing date. It recites May 30, 2007, as the filing date on Plaintiff's "Application Summary for Supplemental Security Income," (Tr. 112), and May 31, 2007, as the filing date in the ALJ's decision. (Tr. 7). The difference is not material to the analysis at bar. The Court refers to the filing date throughout this Ruling as May 31, 2007, which is the date recited in the ALJ's decision.

initially, and again, upon reconsideration.  (Tr. 7; 65; 66-73; 74-76).  On June 23, 2008, Plaintiff filed a request for hearing before an Administrative Law Judge ("ALJ"), (Tr. 7; 81-83) and on December 1, 2009, a hearing was held before ALJ Eileen Burlison in New Haven.  On February 26, 2010, ALJ Burlison issued a decision in which she concluded that Plaintiff is not disabled.  (Tr. 7-15).  On June 4, 2010, the Commissioner issued its Notice of Review Board Action, informing Plaintiff that the Decision Review Board did not complete a timely review of her claim, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  Plaintiff initiated the instant action thereafter.  Doc. [2].

## II.   RECORD EVIDENCE

The following evidence concerns Plaintiff's activities of daily living and medical history and is relevant to this disposition.

## A.   <u>Activities of Daily Living</u>

As part of her application for SSI benefits, Plaintiff indicated in the Commissioner's "disability report," dated July 20, 2007, that apart from attending "doctor appointment[s] or group [therapy sessions]," she only leaves home "for food [and to visit] children," for whom she "cook[s]" and "clean[s]."  (Tr. 153; 156).  She claimed that she generally "stay[s] home where [she] feel[s] safe."  (Tr. 156).  Her children, she said, are the only people she trusts.  (Tr. 158).  Plaintiff also indicated that she prepares her own meals on daily basis, takes public transportation, goes shopping, pays her own bills, uses computers, and is able to count change.  (Tr. 157).  She claimed that she watches television, but as a result of her condition is no longer able to partake in swimming, her principle hobby, for fear of drowning.  (*Id.*).

Plaintiff also testified at the hearing before the ALJ that she "help[s]" her sister, and "help[s]"

her mother, who suffers from arthritis.  (Tr. 40).  She goes shopping with her mother, helps her

daughter with homework, and provides childcare to her granddaughter.  (Tr. 41, 43).  Apart from

the periodic support she provides her family members, Plaintiff testified that she volunteers at a local

restaurant, where she cleans tables.  (Tr. 41-42; 54).

Shortly after filing her application for SSI benefits, Plaintiff began working twenty hours a

week as a cashier at Price Rite.[3]  (Tr. 162).  She did not include this information in the "activities

of daily living form" she submitted to the Commissioner shortly after applying for SSI benefits.

Rather, where asked on that form to describe what she does from the time she wakes up until the

time she goes to bed, she indicated that she showers, goes to the Connecticut Community for

Addiction Recovery Center to use the phone and computers, and attends relapse prevention meetings

and therapy sessions.  (Tr. 153).

## B.    Treatment Notes

Plaintiff's medical records begin with a treatment note from the Southwest Connecticut

Mental Health System ("SCMHS"), dated December 25, 2003, which indicates that Plaintiff was

diagnosed with major depression disorder with a Global Assessment Functioning ("GAF") score of

50.[4]  (Tr. 255).  She also reported at this time that she was hearing voices, most prominently the

voice of an ex-boyfriend.  (Tr. 257).  On July 9, 2004, Plaintiff was diagnosed with schizoaffective

disorder, with depressed mood, insomnia, and auditory and visual hallucinations.  (Tr. 250-51).  Her

---

[3]Plaintiff was paid $7.60 per hour at this job.  The Commissioner did not consider this
employment to be substantial gainful activity.  (Tr. 168).

[4]A GAF score of 41-50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school
functioning (e.g., no friends, unable to keep a job)."  Diagnostic and Statistical Manual of Mental
Disorders, 4th ed., at 32 ("DSM-IV") (emphasis omitted).

4

GAF score remained at 50.  (Tr. 251).

Shortly after this diagnosis, Plaintiff began to receive mental health treatment from Delia Lebron, PhD of the Bridgeport Community Health Center ("BCHC").  (Tr. 241-46).  Dr. Lebron determined that Plaintiff was not suffering from bipolar disorder, but like the staff at SCMHS diagnosed Plaintiff with schizoaffective disorder.  She rated Plaintiff's GAF between 40 and 45.  (Tr. 246).  Plaintiff's last treatment session with Dr. Lebron was on November 18, 2004.  (Tr. 241).  By May of the following year, Plaintiff began her prison sentence, where she received mental health treatment from the Connecticut Department of Correction Health Center ("DOC").  (Tr. 209-212)

On May 13, 2005, a DOC psychiatrist (her name is illegible) diagnosed Plaintiff with opiate dependence, cannabis abuse, mixed personality disorder, and rated her GAF at 50.  (Tr. 210).  DOC treatment notes indicate that Plaintiff was being prescribed Remeron at this time.  (Tr. 212).  Toward the end of her prison sentence, Plaintiff's clinical record indicate that her mood was stable and that she was not showing signs of psychosis.  (Tr. 211).

On February 9, 2007, Plaintiff was released from prison and entered a halfway house.  (Tr. 211).  Plaintiff began to participate in the "Women Offenders' Program" sponsored by the Center for Women and Families.  (Tr. 264-65).  She indicated during the intake interview with Women Offenders' that she suffered from depression and used marijuana.  (Tr. 267).  Over the course of the next year, however, Plaintiff attended individual counseling sessions and was described as an "active participant," in group counseling sessions, which she regularly attended until being discharged from the program on July 22, 2008.  (Tr. 268-74).

Around this time, Plaintiff also began returning to the BCHC to receive treatment for various, mostly physical, ailments, including, back pain, chest congestion, trouble breathing, and

sore throat  (Tr. 237-40).   Treatment notes from the BCHC dated June 2007 to September 2009,

indicate that Plaintiff was being prescribed Remeron and Risperdal during this period; however,

Plaintiff did not resume mental health treatment with Dr. Lebron, who she saw prior to her prison

sentence.   At one visit with another BCHC staff member on April 14, 2009, however, Plaintiff

indicated that she felt anxious and depressed due, in part, to the "death of her son's friend."  (Tr.

238).  She also complained of anxiety and depression at visits in July and August of that year.  (Tr.

276-77).

**C.**     **Opinion Evidence**

Apart from the treatment notes described above, the balance of the medical reports in the

administrative record is comprised of the following opinion evidence: the "psychiatric examination

report" by Jesus A. Lago, M.D. (the Commissioner's consultative examiner), dated October 5, 2007

(Tr. 213-15; 248-49); the "mental residual functional capacity assessment" and "psychiatric review

technique" by Hedy Augenbraun, PhD (the Commissioner's non-consultative, or reviewing,

examiner), dated October 10, 2007 (Tr. 216-19; 220-33); the "mental residual functional capacity

assessment" by Delia Lebron, PhD (Plaintiff's treating physician[5]), dated November 21, 2007 (Tr.

234-35); and the "medical assessment of ability to do work-related activities (mental)" by Valerie

Gillies, LMFT (Plaintiff's therapist), dated January 21, 2009) (Tr. 287-89).

As part of her application for SSI benefits, Plaintiff was directed to visit the Commissioner's

consultative examiner, Dr. Lago, on October 5, 2007.  (Tr. 213-15, 248-49).  Dr. Lago noted that

Plaintiff had a "four year history of heroin and marijuana use" that is now in "full remission."  (Tr.

---

[5]Dr. Lebron is an "acceptable medical source" such that the treating physician rule, discussed *infra*, applies to her opinion. 20 C.F.R. § 416.913(a); *id.* 416.927(a)(2), (c)(2); *see Bushey v. Colvin*, 552 Fed. Appx. 97, 98 (2d Cir. 2014).

6

214-215).  He also indicated that Plaintiff "report[ed] a case of hearing voices," and observed that she was "somewhat paranoid," and stressed about her part time job at a supermarket, but did not render a formal diagnosis based on those symptoms.  (*Id.* at 214).  With respect to her mental status generally, Dr. Lago noted that Plaintiff seemed "'[d]epressed,'" but nevertheless "socially appropriate and engageable," and "not acutely suicidal, homicidal or psychotic."  (*Id.* at 215).  Her "cognition was intact" and was "oriented" in terms of person, place and time.  (*Id.*).  Based on these impressions, Dr. Lago concluded that while Plaintiff was depressed, she did not suffer from "major depression," or "dysthymia."  (*Id.*).  His prognosis was optimistic: "With the proper psychiatric care and followup," said Dr. Lago, "Ms. Rivera's condition should improve."  (*Id.*).

Based on Dr. Lago's consultative examination report and other evidence in the record, Dr. Augenbraun, the Commissioner's reviewing examiner, prepared on October 10, 2007, a "mental residual functional capacity assessment" (or "mental RFC") and a "psychiatric review technique." Dr. Augenbraun indicated that Plaintiff "has given conflicting info in prior claims . . . about her [history]," and noted that she was at one point registered as a certified nursing assistant, and worked as a home health aide.  (Tr. 218; 232).  Dr. Augenbraun also found inconsistencies in Plaintiff's instant application; namely that her "activities of daily living" submission "did not reflect the fact that she working" as a cashier at Price Rite.  (Tr. 218).  Concluding that Plaintiff "is not fully credible re[garding] the extent of [her] limitations,"  Dr. Augenbraun gave "considerable [weight]" to the diagnosis of Dr. Lago, which, she found, was "well supported and consistent with other data." (*Id.*).  Accordingly, Dr. Augenbraun determined that Plaintiff had only "mild" restrictions of activities of daily living"; "mild" difficulties in maintaining social functioning; "moderate" difficulties in maintaining concentration persistence or pace; and no episodes of decompensation.

(Tr. 230).

At the direction of the Commissioner, Plaintiff's treating physician, Dr. Lebron of the BCHC, also completed a mental RFC assessment of Plaintiff's functional limitations. Although the record indicates that Plaintiff visited the BCHC periodically between June 2007 and September 2009 for various ailments and to have her prescriptions for Remeron and Risperdal refilled, Dr. Lebron was not administering mental health treatment to Plaintiff when she completed the mental RFC assessment for Plaintiff on November 21, 2007. Those sessions ceased on November 18, 2004, a number of months before Plaintiff began serving her prison sentence in spring of the following year. (Tr. 241). In her assessment of Plaintiff's mental functional capacity, Dr. Lebron nevertheless concluded that Plaintiff was "markedly limited" — the most severe category of functional limitation expressed on the Commissioner's functional assessment form — in competencies related to "understanding and memory," "sustained concentration and persistence," and "social interaction." (Tr. 234-35). Her conclusions in this respect conflict with Dr. Augenbraun's assessment of Plaintiff's functional capacity that illustrate only "mild" or "moderate" limitations. (Tr. 230).

The record also contains opinion evidence from Valerie Gillies, LMFT, who indicated that she had been counseling Plaintiff for two years.[6] In comments on the Commissioner's medical assessment form, which she completed on January 21, 2009, Ms. Gillies stated:

> I have not done testing on Carmen, but in working with her for [two] years, I have noticed that she consistently has difficulty with basic skills and cognitive abilities. She is unable to stay focused on goals and to manage many basic life skills tasks. It was a frequent event that she had given someone her food money or had not thought through what would happen if she didn't save some of whatever she

---

[6]There are no treatment notes from Ms. Gillies in this record; only her assessment of Plaintiff's ability to do work-related activities.

8

> had for later in the week/month.  I also suspect a degree of underlying psychosis as she has exhibited, on several occasions, a break from reality in her thinking.   I haven't seen a detailed psychiatric eval[uation] one her, so [I] don't have hard proof of that, however, just my clinical experience.

(Tr. 288-89).  Ms. Gillies also noted that Plaintiff "is often stressed and anxious to the point where it interferes with her functioning." (Tr. 287).  In contrast to this commentary, Ms. Gillies concluded that Plaintiff has "fair" to "good" ability to make occupational and personal-social adjustments.[7]  (Tr. 287-88).  She departed from these assessments in two categories, however.  She determined that Plaintiff had no ability to "understand, remember, and carry out complex job instructions," but had an "unlimited/very good ability" to "understand, remember, and carry out simple job instructions." (Tr. 288)

### III.   STANDARD OF REVIEW

In reviewing a final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c), the district court performs an appellate function.  *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981); *Igonia* v. *Califano*, 568 F.2d 1383, 1387 (D.C. Cir. 1977).  A reviewing court will "set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  *See also Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("As a general matter, when we review a decision denying benefits under the Act, we must regard the [Commissioner's] factual determinations as conclusive unless they are

---

[7]There is less than full consistency among the various forms the Commissioner uses to assess functional limitations.  The form used by Ms. Gillies directs clinicians to rate the functional capacities of their patients as either "unlimited/very good," "good," "fair," or "poor/none," whereas the forms provided to Dr. Lebron and Dr. Augenbraun includes instructions to rate the functional capacities of patients as being either "not significantly limited," "moderately limited," "markedly limited," or there being "no evidence of limitation in this category."  (Tr. 216-17; 234-35; 287-88).

unsupported by substantial evidence") (citations omitted). "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol*. *Edison Co*. *v*. *NLRB*, 305 U.S. 197, 229 (1938)).  *See Yancey v. Apfel*, 145 F.3d 106, 110 (2d Cir. 1998); *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

In determining whether the evidence is substantial, the Court must "take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp*. *v*. *NLRB*, 340 U.S. 474, 488 (1951).  *See also New York v. Sec'y of Health and Human Servs*., 903 F.2d 122, 126 (2d Cir. 1990) (stating that the court, in assessing whether the evidence which supports the Commissioner's position, is required to "review the record as a whole") (citations omitted).  Still, the ALJ need not "reconcile every conflicting shred of medical testimony." *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981).  In sum, "the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision." *Morris v. Barnhardt*, No. 02cv0377 (ALJ), 2002 U.S. Dist. LEXIS 13681, at * 12 (S.D.N.Y. July 26, 2002).

The regulations promulgated by the Commissioner establish a five-step analysis for evaluating disability claims. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); 20 C.F.R. § 416.920. First, the Commissioner considers if the claimant is presently working in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i).  If not, the Commissioner next considers if the claimant has a medically severe impairment. *Id.*; § 416.920(a)(4)(ii).  If the severity requirement is met, the third inquiry is whether the impairment is listed in Appendix 1 of the regulations or is equal to a listed impairment. *Id.*; § 416.920(a)(4)(iii) Pt. 404, Subpt. P. App. 1.  If so, the disability is granted.  If not, the fourth inquiry is to determine whether, despite the severe impairment, the claimant's residual

10

functional capacity allows him or her to perform any past work.  *Id.*; § 416.920(a)(4)(iv).  If a claimant demonstrates that no past work can be performed, it then becomes incumbent upon the Commissioner to come forward with evidence that substantial gainful alternative employment exists which the claimant has the residual functional capacity to perform.  *Id.*; § 416.920(a)(4)(v).  If the Commissioner fails to come forward with such evidence, the claimant is entitled to disability benefits.  *Alston v. Sullivan*, 904 F.2d 112, 126 (2d Cir. 1990); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 2012).  While the claimant bears the burden of proving the first four steps, the Commissioner must prove the final one.  *Berry v. Schweiker*, 675 F.2d at 467.  Thus, if the claimant is successful in showing that he is unable to continue his past relevant work, "the [Commissioner] then has the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy."  *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).

## IV.  DISCUSSION

### A.   <u>Summary of the ALJ's Decision</u>

Following the five step evaluation process, the ALJ found at step one, that Plaintiff has not engaged in substantial gainful activity since May 31, 2007, the date of her application.  (Tr. 9).  At step two, the ALJ found that Plaintiff has the following severe impairments: depression and polysubstance abuse.  (*Id.*); 20 C.F.R. § 416.920 (c).  At step three, the ALJ found that Plaintiff's impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P of 20 C.F.R. Part 404.  (Tr. 10-11).

Before proceeding to steps four and five, the ALJ evaluated the entire record in order to

determine Plaintiff's residual functional capacity.[8]  The ALJ considered all of Plaintiff's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence in the record.  (Tr. 11).  With respect to Plaintiff's symptoms, the ALJ noted Plaintiff's allegations that she was anxious, endured crying spells, and experienced auditory hallucinations.  (Tr. 12).  Comparing those symptoms to the medical record however, the ALJ concluded that the "objective medical evidence of record . . . is extremely sparse," "provides little support to [Plaintiff's] allegations," and "does not support the level of impairment alleged."  (Tr. 13).  The ALJ noted, for example, that with respect to Plaintiff's "references to crying spells and auditory hallucinations, treatment records for the relevant time period fail to corroborate more than occasional complaints."  (*Id.*).  The ALJ also cited promising treatment records from the Women Offenders' Program, which indicated that Plaintiff was "actively involved" in its programming, was "complaint with all group requirements," and that Plaintiff had even "told her case manager that she had started looking for employment."  (*Id.*).  The ALJ was also impressed by the Plaintiff's "extremely wide range of daily activities," which she noted includes carrying for her arthritic mother, providing childcare to her granddaughter, helping her teenage daughter with schoolwork, and volunteering at a local restaurant.  (Tr. 12).  The ALJ concluded that Plaintiff's alleged symptoms do "not significantly impact" her activities of daily living.  (*Id.*).

Turning next to the opinion evidence, the ALJ stated that she was "not persuaded by Dr. Lebron's . . . opinion that [Plaintiff] has marked limitations in her ability to adapt, interact socially, sustain concentration and persistence, and understand and remember."  (Tr. 13).  While stating that

---

[8]A person's residual functional capacity is the most "one can still do despite [her] limitations."  20 C.F.R. § 416.945(a).

she would consider Dr. Lebron's findings, the ALJ concluded that she would not assign her opinion "controlling weight" based on the fact that "there are no contemporaneous objective records to support" that opinion.  (Tr. 13).

The ALJ next considered the mental ability assessment completed by Ms. Gillies.  The ALJ indicated that "despite finding good to fair abilities" in functional competencies, Ms. Gillies nevertheless concluded that Plaintiff "'is often stressed and anxious to the point where it interferes with her functioning.'"  (Tr. 13).  Citing "inconsistencies within the assessment," and countervailing evidence indicating that Plaintiff's activities of daily living were not affected by her symptoms, the ALJ resolved not to assign "significant weight" to the opinion of Ms. Gillies.  (*Id.*).

In contrast, the ALJ assigned "substantial weight" to the findings of the Commissioner's consultative examiner Dr. Lago, and reviewing examiner Dr. Augenbraun, whose opinions, she noted, "are not inconsistent with the medical evidence as a whole."[9]  (Tr. 14).

Based on her review of the medical evidence in the record and her assessment of Plaintiff's symptoms, the ALJ concluded that Plaintiff had the:

> residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to performing simple routine tasks and can have only brief and superficial contract with the general public.

(Tr. 11).

After determining Plaintiff's residual functional capacity, the ALJ proceeded to step four and

---

[9]As Plaintiff contends, and as the Court discusses *infra*, the ALJ did not reference either Dr. Augenbraun or Dr. Lago by name; rather, referred to them only as "state agency physicians" and "non-examining and non-treating expert sources."  (Tr. 14).

concluded that Plaintiff has no past relevant work as defined in 20 C.F.R. § 416.965.[10]  (Tr. 14).

Finally, at step five, the ALJ found that, given Plaintiff's residual functional capacity and limitations,

age, education and work experience, when considered within the framework of the Medical

Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, there are jobs that exist in

significant numbers in the national economy that Plaintiff can perform.  (Tr. 14).  Accordingly, the

ALJ concluded that Plaintiff is not disabled within the meaning of the Social Security Act.  (Tr. 14).

**B.    Analysis**

As discussed above, a reviewing court will "set aside the ALJ's decision only where it is

based upon legal error is not supported by substantial evidence."  *Balsamo v. Chater*, 142 F.3d at

79.  Plaintiff claims that the ALJ erred in: (1) declining to accord controlling weight to the opinion

of Dr. Lebron; (2) relying on the opinions of the reviewing and consultative examiners, Dr.

Augenbraun and Lago; (3) finding that Plaintiff engaged in an "extremely wide range of daily

activities"; (4) failing to order a consultative examination; and (5) failing to provide adequate

rationale for her assessment of Plaintiff's residual functional capacity.  I discuss these claims

*seriatim*.

**1.    Treating Source Opinion**

Plaintiff first claims that the ALJ erred in affording less than controlling weight to the

treating source opinion of Dr. Lebron.  In contrast to less restrictive functional assessments by Dr.

---

[10]Dr. Augenbraun noted that Plaintiff previously worked as a home health aide.  (Tr. 218).
Treatment notes from the BCHC also indicate that Plaintiff worked as a home health aide for three
years, circa 1994.  (Tr. 244).  Pursuant to 20 C.F.R. § 416.965, the Commissioner only considers
work experience as vocational factor when it is "substantial gainful activity," and when it was
performed "15 years or more before the time" a disability determination is rendered.  *Id.*  Although
the ALJ's conclusion at step four implies that one or both criteria under § 416.965 were not met, the
ALJ did not make specific findings in this regard.

Augenbraun, Dr. Lebron found that Plaintiff suffered from *marked* limitations in a majority of functional competencies relating to "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation." (Tr. 234-35). The ALJ was careful to indicate the she had not ignored Dr. Lebron's opinion completely; however, she declined to give Dr. Lebron's opinion controlling weight because it was not supported by "contemporaneous objective records." (Tr. 13).

The treating physician rule provides that an ALJ should defer to "the views of the physician who has engaged in the primary treatment of the claimant." *Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). "[A] treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)" will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (noting that it is the Commissioner's role to resolve "genuine conflicts in the medical evidence," and that a treating physician's opinion is generally "not afforded controlling weight where the treating physician issued opinions that are not consistent with the opinions of other medical experts") (internal alterations, quotation marks, and citation omitted)). If the ALJ refuses to accord controlling weight to the medical opinion of a treating physician, the ALJ must consider various factors when evaluating how much weight to assign to treating physician's opinion, including the length and nature of the treatment relationship, frequency of examination, his or her specialization, and the supportability and consistency of the opinion with the record as a whole. *See Cichocki v. Astrue*, 534 F. App'x 71, 74-75 (2d Cir. 2013); 20 C.F.R. § 416.927.

15

Plaintiff last received mental health treatment from Dr. Lebron on November 18, 2004, which was several months prior to her incarceration.  (Tr. 241).  When she returned to the BCHC for periodic visits on a handful of occasions between June 16, 2007, and November 20, 2007, she met with either a clinician named Baron or a physician's assistant called Barlow (their first names are not recorded legibly in the record).  Therefore, when Dr. Lebron rendered her assessment of Plaintiff's mental residual functional capacity on November 21, 2007, she had done so a full *three years after* her last counseling session with Plaintiff on November 18, 2004.  (Tr. 234-35; 241). Having provided an assessment of Plaintiff's functional capacities three years after she treated Plaintiff, the ALJ could not have reasonably concluded that Dr. Lebron's opinion was supported by the "medically acceptable clinical and laboratory diagnostic techniques" the regulations require.  20 C.F.R. § 416.913(a); *id.* § 416.927(c)(2); *see also Kennedy v. Astrue*, 343 Fed. Appx. 719, 721 (2d Cir. 2009) (treating physician "form . . . not corroborated by . . . contemporaneous treatment notes" supported conclusion that ALJ had not traversed the substance of the treating physician rule).

Plaintiff claims that ALJ nevertheless erred because closer inspection of the functional assessment form signed by Dr. Lebron on November 21, 2007, would have revealed that the form was *also signed* by Baron and Barlow, who, crucially, saw the Plaintiff both in 2004, and in 2007 prior to the assessment of Plaintiff's functional capacities they rendered in concert with Dr. Lebron that same year.  This argument fails for two reasons.  First, because neither Baron nor Barlow are "acceptable medical sources[s]," the treating physician rule does not apply to their opinion.  20 C.F.R. § 416.913(a); *id.* § 416.927(a)(2), (c)(2); *see Bushey v. Colvin*, 552 Fed. Appx. 97, 98 (2d Cir. 2014).  Second, treatment notes from 2007 recorded by Baron or Barlow (which are both few in number and brief in form) do not reflect the degree of limitations found in the functional

16

assessment they co-signed with Dr. Lebron.  In general, those notes record Plaintiff's symptoms (e.g., anxiety and depression) and the medicine she was taking (i.e., Remeron and Risperdal), but offer little else the in the way of corroborating their conclusions concerning Plaintiff's "marked" functional limitations.  (Tr. 234-35; 237-239).  The ALJ was therefore not required to accord controlling weight to the functional assessment rendered by Dr. Lebron (and Baron and Barlow as co-signers) since it was not supported by contemporaneous and corroborating treatment notes from an acceptable medical source.

### 2.    Opinions of Consultative and Reviewing Examiners

Plaintiff next claims that the ALJ erred by according "substantial weight" to the opinions of the "non-examining and non-treating sources." (Tr. 14).  Plaintiff claims that remand is warranted on grounds that the ALJ's discussion of this evidence was inadequate and that the ALJ's reliance on this evidence was improper.

The discussion of the evidence was inadequate and requires remand, Plaintiff argues, because the ALJ "never named those . . . sources," (that is, she never mentioned Dr. Augenbraun and Dr. Lago by name) "never specified what those . . . sources found," and "never explained why the opinions of those . . . sources merited credit over the contrary opinions of . . . treating and examining sources." Doc. [23] at 5.  The Court disagrees.  The Plaintiff was not prejudiced by the ALJ's failure to mention Dr. Augenbraun and Dr. Lago by name; it was sufficient to refer to them as "state agency physicians" and "non-examining and non-treating sources."  (Tr. 8).  Nor did the ALJ err in discussing their opinions only briefly.  A protracted discussion was not required given that the ALJ had comprehensively set forth its reasons for not fully crediting the other medical evidence in the record.

The ALJ's brief discussion of the evidence aside, Plaintiff claims that it was improper in the first instance for the ALJ to rely on the functional assessment rendered by Dr. Augenbraun because that opinion is inconsistent with the treatment notes she reviewed from DOC and SCMHS. Plaintiff also claims that Dr. Augenbraun's assessment of her functional capacity is unreliable because that evaluation was completed without the benefit of reviewing the functional assessments by Dr. Lebron and Ms. Gillies, who completed their reports *after* Dr. Augenbraun's assessment. The Court is not persuaded by either argument.

It is of no moment that Dr. Augenbraun did not have the benefit of reviewing Dr. Lebron's functional assessment, because, as I explained *supra*, that treating source opinion was divorced from contemporaneous and corroborating treatment notes and is less than fully reliable. 20 C.F.R. § 416.927(c)(2); SSR 96-2p. Moreover, Dr. Augenbraun, had, in any event, the benefit of reviewing Dr. Lebron's 2004 treatment notes from when she was actually treating the Plaintiff — an objectively more reliable source than Dr. Lebron's functional assessment completed three years later. (Tr. 232; 241-42). The Court cannot conclude that Dr. Augenbraun's evaluation of Plaintiff's functional limitations did not account for those treatment notes. (*Id.*).

Likewise, the other functional assessment that was rendered after Dr. Augenbraun's evaluation — the one rendered by Ms. Gillies — offers little insight into Plaintiff's psychological impairments that is not documented in the medical record that Dr. Augenbraun did review, which, in addition to Dr. Lebron's treatment notes, included Dr. Lago's consultative report, and treatment records from DOC. Furthermore, Ms. Gillies's assessment of Plaintiff's mental functional capacities as between "good" and "fair" is not entirely inconsistent with Dr. Augenbraun's determination that Plaintiff's mental functional capacities were either "not significantly limited" or "moderately

18

limited." (Tr. 216-17). Therefore, there is no basis to conclude that Dr. Augenbraun would have arrived at different conclusions in that respect had she rendered her assessment after reviewing one completed by Ms. Gillies.

The Court is also not persuaded by Plaintiff's claim that Dr. Augenbraun's functional assessment failed to account fully for diagnoses contained in treatment notes from DOC and SCHMS. As noted earlier, a DOC psychiatrist diagnosed Plaintiff with mixed personality disorder. (Tr. 210). Health Professionals at SCHMS diagnosed Plaintiff with shizoaffective disorder, major depressive disorder, and noted that she was experiencing depressed mood, insomnia, and auditory and visual hallucinations. (Tr. 250-57). Treatment notes from both the DOC and SCHMS indicate that Plaintiff was diagnosed with a GAF score of 50. (Tr. 210; 250; 254-55).

As an initial matter, a GAF score of 50 does not, *ipso facto*, direct a finding of disability, or even a restrictive assessment of one's functional capacity. *See* 20 C.F.R. § 416.926(e)(4)(i) (ALJ is not allowed to rely on any test score alone). One judge in this Circuit recently called the GAF assessment a "deprecated psychological metric," based on the fact that it is has been dropped from the latest edition of the *Diagnostic Statistical Manual of Mental Disorders. Mainella v. Colvin*, No. 13cv2453, 2014 WL 183957, * 1, 5 (JG) (E.D.N.Y. Jan. 14, 2014). Moreover, the Social Security Administration has recently limited the use of GAF scores on grounds that it does not represent "standardize[d] measurement and evaluation," "is not designed to predict outcomes," and is off little probative value in the absence of "additional supporting description and detail." *Id.* at 5 (internal quotation marks omitted; citations omitted). In rendering her assessment of Plaintiff's functional capacity, a GAF score was but one of many factors Dr. Augenbraun was to consider, albeit one of dubious value.

Furthermore, while medical records from DOC and SCHMS were certainly probative of Dr. Augenbraun's functional assessment, they were not dispositive. They represent only *some* of the evidence that Dr. Augenbraun was given to review, and also the *oldest* — the treatment notes from the SCHMS were dated December 2003 and July 2004, several years before Plaintiff's application for SSI in May 2007, when she became eligible for benefits. Likewise, more recent records from the BCHC indicate little more than that Plaintiff suffered from depression and anxiety. And Dr. Lago, who had the benefit of examining Plaintiff first hand, was optimistic that her condition would improve. Crucially, however, Dr. Augenbraun also relied on non-medical evidence in the record, including her work history and activities of daily living, which she found to be inconsistent with Plaintiff's alleged limitations. Dr. Augenbraun found it noteworthy, for example, that Plaintiff was working part time as a cashier, previously worked as a home health aide, and was providing childcare for a grandchild. (Tr. 218). On balance, the Court cannot conclude that Dr. Augenbraun's functional assessment was not supported by substantial evidence.

For the ALJ to rely on the medical opinions of Dr. Augenbraun and Dr. Lago was not improper given that those opinions were "not inconsistent with other substantial evidence," or contradicted by a *reliable* treating source opinion concerning Plaintiff's residual functional capacity. *Schisler v. Sullivan*, 3 F.3d 563, 569 (2d Cir. 1993) ("the opinions of nonexamining sources [may] override treating sources' opinions, provided they are supported by evidence in the record"); *see also* 20 C.F.R. § 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians and psychologists who are experts in Social Security disability evaluation."). Those opinions offered crucial guidance in the absence of an informative treating source opinion. Accordingly, the Court concludes that the ALJ did not err in according "substantial weight" to the

medical opinions of the consultative and reviewing examiners.

### 3.    Activities of Daily Living

Apart from the medical evidence of record, the ALJ's decision denying Plaintiff's benefits was also informed by her finding that Plaintiff engaged in an "extremely wide range of daily activities" in spite of her alleged symptoms. (Tr. 12).  Plaintiff argues that the ALJ's finding in this regard was based on her "consistent use of leading questions [at the administrative hearing] and her failure to consider [P]laintiff's testimony upon examination by her attorney." Doc. [13-1] at 21.  As Plaintiff puts it, "the ALJ's description" of Plaintiff's activities of daily living "is a narrative of her own making."  *Id.*

Plaintiff argues, toward this end, that there is no truth to the ALJ's finding that Plaintiff "cares for her disabled mother and [two] year old grand daughter." Doc. [23] at 8; (Tr. 12).  The record, however, indicates that when the ALJ asked Plaintiff to described her daily routine, Plaintiff responded, "I help [my sister].  I help my mother.  She's got arthritis in her feet and hands." (Tr. 40).  Plaintiff went on to indicate that she goes shopping "with her [mother]," noting that "it's winter" and "[h]er hands freeze." (Tr. 41). When asked if she takes care of her granddaughter, she answered in the affirmative and added that she "drive[s] her around with the carriage." (Tr. 43).  Plaintiff also indicated during the administrative hearing that she makes her daughter lunch and helps her with homework. (Tr. 41-43).  Moreover, where asked on the Commissioner's "activities of daily living" form if she "take[s] care of anyone else, such as a wife/husband, children, grandchildren, parents, friends, [or] other [person]," Plaintiff checked "yes," and added that she "cook[s]" and clean[s]" for her children. (Tr. 153).

Plaintiff also argues that the ALJ improperly concluded that Plaintiff "cleans her room and

washes clothes." Doc. [23] at 8. In point of fact, the ALJ stated in the administrative decision that Plaintiff "is *able* to do laundry and clean her room." (Tr. 12) (emphasis added). That finding was reasonably premised on Plaintiff's testimony that she "tr[ies] to do a lot of stuff . . . [like] clean [her] room, wash clothes and stuff life that," as well as Plaintiff's representation that she cooks and cleans for her children. (Tr. 45; 145).

Plaintiff also claims that the ALJ erred in finding that Plaintiff "volunteers a couple hours a day at a local restaurant." (Tr. 12). This finding, Plaintiff argues, is unreasonable because Plaintiff did not indicate on the record that those two hour volunteering sessions occur on a *daily* basis, for as she explains, it could well be that she volunteers only weekly or monthly. Doc. [13-1] at 22. The Court concludes, however, that the ALJ's finding that Plaintiff regularly volunteers at a restaurant is reasonably supported by Plaintiff's testimony that she volunteers  "[not] every day . . . [l]ike I go four times." (Tr. 54). The regularity with which she volunteers aside, the record also indicates that within one month after filing her application for SSI benefits, Plaintiff began working twenty hours a week as a cashier at Price Rite. (Tr. 162). Plaintiff rather disingenuously failed to indicate this employment on the Commissioner's "activities of daily living" form. (Tr. 153-60).

Plaintiff claims, however, that her volunteer work at the restaurant is not, as the ALJ found, a reflection of her ability to work; but rather, indicia of her emotional dysfunction. She only works there, she explains, "because she is hungry, lonely and depressed" and because there are people there to keep her company. Doc. [13-1] at 23; Doc. [23] at 10. As if to suggest that she could not be *doing work* when she volunteers at the restaurant, Plaintiff queries the Court: "What restaurant accepts services from volunteers?" Doc. [13-1] at 22. No such restaurant she concludes: "there is no such thing as  'volunteering' at a private restaurant." Doc. [23-1] at 10. Plaintiff argues that the

ALJ should have appreciated that reality and surmised that she was volunteering there not to work, but in order to abate her depression by associating with other people.  Having failed to draw that inference, Plaintiff argues that the ALJ's interpretation of her testimony was "disingenuous" and "literal."  Doc. [13-1] at 23.  In essence, Plaintiff asks this Court to conclude that the ALJ erred by interpreting her testimony literally, or, put another way, to conclude that Plaintiff's testimony that she volunteers does not qualify as substantial evidence that she volunteers.

The Court finds Plaintiff's argument in this respect unpersuasive.  The ALJ was not required to intuit what Plaintiff now claims is the real reason she volunteered at the restaurant.  Furthermore, although her time at the restaurant no doubt lifted Plaintiff's spirits, there is no basis in the record to conclude that Plaintiff was not engaging in work activity when she went there to volunteer.  On the contrary, the evidence suggests that she was *working* during that time.  As it turns out, she was being paid in tips for her services (albeit not an hourly wage).  (Tr. 42).  One gathers those tips represented compensation for worked performed as opposed to an award in recognition of regular patronage.  It was therefore entirely proper for the ALJ to conclude that Plaintiff was performing work activity when she testified to volunteering at the restaurant, and to factor that testimony into her ultimate determination of Plaintiff's residual functional capacity.

In sum, the Court concludes that the ALJ's findings concerning Plaintiff's activities of daily living are supported by substantial evidence.

### 4.   <u>Consultative Examination</u>

Plaintiff next claims that the ALJ erred by failing to order a second consultative examination. She argues that a second consultative examination was required because the ALJ "chose not to mention or rely on Dr. Lago's unreliable psychiatric report."  Doc. [13-1] at 30.

There is no basis on this record for the Court to conclude that Dr. Lago's consultative examination report was unreliable or that the ALJ ignored it in her analysis of Plaintiff's application. As an initial matter, it is clear from the decision of the ALJ that she accorded "substantial weight" to the opinion of Dr. Lago in spite of her failure to mention him by name. The ALJ stated:

> In accordance with Social Security Rule 96-6p, I have considered the administrative findings of fact made by the state agency physicians. While the undersigned is mindful that these opinions are from non-examining and non-treating expert sources, they are not inconsistent with the medical evidence as a whole, and are therefore accorded substantial weight in determining the claimant's residual functional capacity . . .

(Tr. 14). There is therefore no basis for this Court to conclude that the ALJ did not consider the opinion of Dr. Lago who along with Dr. Augenbraun are the "state agency physicians" or "non-examining and non-treating expert sources" who offered assessments contained in the record. Thus, no failure on the part of the ALJ to consider the consultative examination directed the ALJ to order a second one.

The Court is also unable to conclude that the opinion of Dr. Lago is inherently unreliable. Plaintiff's claim in this respect is couched partly in the assertion that Dr. Lago "places his own profit margin above the obligation to properly examine and evaluate disability claimants." Doc. [13-1] at 30. There is no evidence in the record to support this claim. Nor is there any evidence in the record that supports Plaintiff's contention that Dr. Lago's consultative examination report was less than fully credible.[11]

---

[11]Plaintiff challenges Dr. Lago's credibility through the affidavit of Zoraida Valentin, a former patient and claimant, who testified, *inter alia*, that Dr. Lago's consultative examination lasted between three and four minutes. (Tr. 208). Even if the nature and duration of Ms. Valentin's examination was unreasonable as a matter of law, to conclude that Plaintiff was given comparably short shrift by Dr. Lago requires this Court to engage in speculation beyond the purview of its

The Court recognizes that Dr. Lago did not have the benefit of reviewing certain treatment notes that were produced from mental health appointments after Dr. Lago's examination of Plaintiff on October 5, 2007.  The medical record in that regard includes treatment notes from BCHC, and the Women Offenders' program, as well the functional assessments rendered by Ms. Gillies and Dr. Lebron.  However, apart from the functional assessment by Dr. Lebron, which this Court has concluded is of limited value, nothing in the balance of the post-October 2007 medical record suggests that the ALJ was required to order a second consultative examination.  *See Firpo v. Chater*, 100 F.3d 943 (2d Cir. 1996) (concluding that the ALJ was not obliged to order a second consultative examination where evidence from the first consultative examination was consistent with laboratory tests and conclusions of claimant's own doctors).

### 5.      ALJ'S Rationale for Residual Functional Capacity Assessment

Finally, Plaintiff claims that the ALJ erred by not providing an appropriate rationale for her assessment of Plaintiff's residual functional capacity.

An ALJ's failure to articulate a basis for her particular findings may alone warrant remand. *See Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982) (per curiam) (concluding that remand is appropriate where the court is "unable to fathom the ALJ's rationale in relation to the evidence in the record" without "further findings or clearer explanation for the decision").  "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases even — and perhaps especially — when those dispositions are unfavorable." *Snell v. Apfel* 177 F.3d 128, 134 (2d Cir. 1999) (remanding case to Appeals Council for a statement of the reasons as to why Commissioner disagreed with treating source opinion).

_____

review.

This is not a case where the ALJ did not explain her findings.  As the Court has recounted in detail in Part IV. A of this Ruling, the ALJ explained — in no small amount of detail — the basis for her determination of Plaintiff's residual functional capacity.  The Court will not repeat that discussion here, except to reiterate that the ALJ considered Plaintiff's activities of daily living, medical history, symptoms of her impairments, and the extent to which those symptoms were consistent with the objective medical evidence, including opinion evidence from Dr. Augenbraun, Dr. Lago, Dr. Lebron and Ms. Gillies.  (Tr. 11-13).  She indicated the amount of weight she assigned to each medical source opinion and her basis for so doing.  (Tr. 13-14).  Based on this analysis, the ALJ rendered an assessment of Plaintiff's residual functional capacity that was supported by substantial evidence.  The Court finds no error in this regard.

## V.  CONCLUSION

The gravamen of Plaintiff's manifold arguments for remand or reversal is that the ALJ's assessment of her functional limitations is not supported by substantial evidence.  I conclude with final words on that primary contention.

Because the inherent deficiencies in the functional assessment rendered by Dr. Lebron precluded the ALJ from according it controlling weight, the ALJ was required to rely on other evidence in the record to determine Plaintiff's residual functional capacity.  20 C.F.R. § 416.927(c)(2); *see also Green-Younger v. Barnhart*, 335 F.3d at 106; *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); SSR 96-2p ("a treating source's opinions on what an individual can still do despite his or her impairment(s) will not be entitled to controlling weight if [for example] substantial, nonmedical evidence shows that the individual's actual activities are greater than those provided in the treating source's opinion).  This evidence included, most notably, opinion evidence

from Dr. Augenbraun, Dr. Lago, and Ms. Gillies, as well as non-medical evidence concerning Plaintiff's activities of daily living and her testimony concerning the limiting effects of her symptoms. (Tr. 11-14).

With respect to medical opinion evidence, Dr. Augenbraun determined that Plaintiff had only mild to moderate functional limitations, and Dr. Lago concluded that although Plaintiff was "depressed," her "condition should improve." (Tr. 215; 216-18; 230). Moreover, Ms. Gillies, who while speculating that Plaintiff suffered from an "underlying psychosis," nevertheless withheld the most severe assessment of Plaintiff's functional limitations expressed on the functional assessment form she completed, and determined that Plaintiff generally had "fair" to "good" ability to make occupational and personal or social adjustments. (Tr. 287-89). Only for the competency related to the ability to "understand, remember, and carry out *complex* job instructions" did Ms. Gillies determine that Plaintiff had no or "poor" functional capacity. (*Id.*) (emphasis added). Apart from the medical opinion evidence, the balance of the medical record does not contain substantial evidence that conflicts with the conclusion of Dr. Augenbraun, Dr. Lago and Ms. Gillies. As the ALJ reasonably concluded, evidence of Plaintiff's "crying spells" and "auditory hallucinations" were not "corroborate[d] by more than occasional complaints." (Tr. 13).

Evidence of a non-medical nature indicates that Plaintiff remains active and able in spite of her alleged symptoms. For example, she cooks and cleans for her children, provides childcare to her granddaughter, and periodically assists her mother. (Tr. 40-43,153). She also volunteers at restaurant, work activity she admits she sought in part because there are people there with whom to talk. Doc. [13-1] at 23; Doc. [23] at 10; (Tr. 54). Plaintiff's testimony that she, as the ALJ put it, "volunteers at the restaurant to be around people" supported the ALJ's conclusion that Plaintiff's

27

"ability to function socially is not drastically impacted." (Tr. 12-13).  The ALJ was also reasonably persuaded by Plaintiff's admission to her case manager at Women Offenders' that she wanted to be employed.  (Tr. 13; 269).  The record evidence of both the medical and non-medical variety is consistent with the ALJ's conclusion that Plaintiff is able to perform a full range of work at all exertional levels provided that work involves simple and routine tasks and only brief and superficial contact with the general public.  (Tr. 11).

Based on the foregoing I conclude that the ALJ's decision is supported by substantial evidence.  This conclusion directs disposition of the pending motions as follows:

1.  Plaintiff's motion to reverse the final decision of the Commissioner or, in the alternative, to remand the this case back to the Commissioner for further proceedings (Doc. #13), is DENIED.

2.  The Commissioner's motion to affirm the decision of the ALJ (Doc. #19) is GRANTED.

The Clerk is directed to close the file.  IT IS SO ORDERED.

Dated: New Haven, Connecticut

October 22, 2014

/s/ Charles S. Haight, Jr.
CHARLES S. HAIGHT, JR.
Senior United States District Judge